IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MECHANICAL SYSTEMS, INC.,

              Plaintiff and Counter-Defendant,

    v.

ND PAPER, INC.,

              Defendant and Counter-Claimant,

and

ND PAPER, INC.,

              Third-Party Plaintiff,

    v.

TONY PUMPER, PAUL LESTER, BILLY
OWENS, JASON KOESTER, and MIKE
PRAHL,

              Third-Party Defendants.

OPINION AND ORDER

20-cv-510-wmc

Among other, related claims, plaintiff Mechanical Systems, Inc. ("MSI") asserts that defendant ND Paper, Inc., breached their contract by allegedly failing to pay for MSI's construction of various large water towers at a paper mill owned and operated by ND Paper. In response to this lawsuit, ND Paper also asserts counterclaims against MSI sounding in breach of contract and tort for allegedly seizing certain equipment meant to be used in the construction of one of those towers. Finally, ND Paper asserts third-party claims against individual officers and employees of MSI based on the same alleged misconduct.

Pending before the court presently are the parties' cross-motions for summary judgment on ND Paper's counterclaims and third-party claims. (Dkt. ##57, 63.) For the

reasons that follow, the court will grant summary judgment to the MSI employees on the entirety of ND Paper's third-party compaint and dismiss them from this lawsuit.  The court will also grant partial summary judgment to plaintiff MSI on ND Paper's conversion counterclaim.  As for ND Paper's other counterclaims, however, the court must deny the remainder ND Paper's motion for summary judgment, finding genuine issues of material fact surrounding MSI's seizure and retention of equipment.

UNDISPUTED FACTS[1]

**A. Overview of the Parties**

Mechanical Systems, Inc., is a Minnesota corporation, with its principal place of business in Dundas, Minnesota.  As reflected by the events surrounding this lawsuit, MSI regularly conducts business in Wisconsin, including in Wisconsin Rapids, where the project in dispute ("the Project") was undertaken.  For all times relevant to those events, Tony Pumper was MSI's Vice President of Operations; Paul Lester was MSI's Project Manager; Billy Owens was MSI's Field Tank Superintendent (also referred to as the "foreman" of the project); Jason Koester was a truck driver for MSI; and Mike Prahl was the crane or equipment operator on the Project.

ND Paper, Inc., is a Delaware Corporation, with its principal place of business in Oakbrook Terrace, Illinois.  ND Paper owns and operates a paper mill in Wisconsin Rapids, Wisconsin.

---

[1] Unless otherwise noted, the court finds the following facts material and undisputed.

**B. Contract**

On April 22, 2019, MSI and ND Paper entered into a contract for the construction of two, 700 tons-per-day ("TPD") water towers and one, 1,000 TPD water tower at MSI's Wisconsin Rapids paper mill, referred in the contract as "the Property," "the Mill" or "Biron Mill." (Compl., Ex. 1 ("Contract") (dkt. #2-1).)  In the Contract, MSI is referred to as "Contractor," while "Owner" refers to ND Paper.  The parties also refer to the towers under dispute interchangeably as "tanks."   The original value of the Contract totaled $2,499.072.00 and required payment of invoices by ND Paper within 30 days of receipt, although on July 22, 2019, it was amended to add construction of other items for an additional $623,993.76.

Material to ND Paper's counterclaims and third-party complaint, Paragraph B of the Contract provides the following, general description of "Equipment":

> The Contractor wishes to design, build, install and sell to the Owner, **700 TPD Dump Tower (1), 700 TPD OCC Storage Tower (1), and 1000 TPD White Water Tower – PM25** and all related equipment, components and part (which, unless the context requires otherwise, are collectively referred to in this Agreement as the "Equipment") all as more particularly described in the technical specification (the "Technical Specifications") attached as Schedule A, for use at the Mill.

(Contract (dkt. #2-1) 2 (emphasis in original).)   Section 6.1 of the Contract further provides:

> The Equipment in all stages of construction and all materials, machinery and equipment from time to time acquired by the Contractor or its suppliers or sub-contractors for the manufacture of the Equipment, whether located from time to time in the Contractor's plant or elsewhere, shall be the property of the Owner to the extent that such Equipment has been paid for by the Owner, and Contractor agrees to perform

> all acts necessary to perfect and assure title, free and clear of all liens and encumbrances, in such Equipment in the Owner. The Contractor shall certify to the Owner on demand at reasonable intervals that title to such Equipment has passed to the Owner. Notwithstanding the foregoing, title to all Equipment for which payment has not been received by the Contractor shall pass to the Owner upon delivery of the Equipment to the Mill.

(*Id.* at 4.)

Finally, again relevant to the counterclaims and third-party complaint, the Contract incorporated "Schedule H -- the General Conditions," including among other things, contains the following limitation of liability clause:

> Except in connection with a Party's indemnification obligations under the Contract and a Party's breach of GC 50 . . . in no event shall either Party, its affiliates, or their respective directors, officers, agents or employees, be liable to the other Party under any theory of tort, contract, strict liability or other legal or equitable theory for exemplary, punitive, indirect, special, lost profits, consequential or similar damages, each of which is hereby excluded by agreement of the Parties regardless of whether or not such Party has been advised of the possibility of such damages.

(Dean Decl., Ex. 2 (dkt. #65-2) 39 at § 58.4.)

### C. Events Surrounding 1,000 TPD Tank

Following execution of the Contract in the spring of 2019, MSI proceeded to bring materials for the construction of the 1,000 TPD tank falling within its description of "Equipment." During the summer of 2019, ND Paper also made two payments to MSI for a total of $360,360.00 toward construction of the 1,000 TPD tank. While the parties agree these payments were made in connection with the construction of this tank, ND Paper contends these payments were solely for steel, and MSI contends that they were not

solely for materials alone, but also covered "process costs for the material." (MSI's Resp. to ND Paper's PFOFs (dkt. #83) ¶ 27.) Moreover, MSI contends that ND Paper has not paid in full for the materials and labor for the 1,000 TPD tank.[2]

MSI further represents that there were a number of design changes and engineering issues that resulted in a delay in finishing the 1,000 TPD tank, extending beyond its original, planned completion date of October 1, 2019. Moreover, MSI further represents that ND Paper failed to make payments timely, resulting in MSI discussing a halt to the project or "demobilizing" in November 2019, with that issue persisting into January 2020. In contrast, ND Paper disputes that it "failed to pay any amounts actually due to MSI," and further represents that by January 2020, it had paid in full for all of the steel needed to construct the 1,000 TPD tank. (ND Paper's Resp. to MSI's PFOFs (dkt. #75) ¶ 10.)

On January 28, 2020, ND Paper emailed MSI about the 1,000 TPD tank, stating:

> We will not pay for any invoices regarding this tank and are with[h]olding funds until detailed construction drawings are received for all tanks. We paid for engineering and design and have not received or approved any detailed drawings. MSI is proceeding here at their own risk.

(Dean Decl., Ex. 14 (dkt. #65-14) 1.) Still, in that same email, ND Paper, however, clarified that it was "not cancelling the contract and wanted MSI to continue," but simply reiterating that it required "detailed drawings," as had been provided for the other tanks

---

[2] ND Paper also paid an additional $88,000 for the 1,000 TPD tank at some other, unidentified time, but does not indicate whether this payment was for Equipment as well.

contemplated in the Contract.  (*Id.*, Ex. 15 (dkt. #65-15) 1.)[3]

**D. Removal and Retention of 1,000 TPD Tank Materials**

On or about February 1, 2020, MSI responded by removing from the Mill materials for the 1,000 TPD tank, maintaining that it did so because of non-payment on the part of ND Paper.  Specifically, Tony Pumper, MSI's Vice President of Operations, directed the other, individual third-party defendants (Lester, Owens, Koester and Prahl) to remove the materials, which MSI also refers to as a "demobilization."  MSI further represents Pumper's directions were issued on behalf of MSI, and Lester, Owens, Koester and Prahl were following those directions in removing the materials.  At the same time, there appears no dispute that these individuals did not have ND Paper's authorization or permission to remove the materials.  Indeed, ND Paper represents that it attempted to prevent an MSI employee from leaving the property with materials by blocking one of the exits, but MSI vehicle's turned around and departed from another exit.[4]

Regardless, MSI is now in possession of the materials intended for completion of the 1,000 TPD tank.  ND Paper estimates that the materials removed constituted "56% of the total weight of the stainless steel" to be used in constructing the tank.  However, MSI also purports to dispute this on the basis that the calculations have not been

---

[3] Later, on February 5, 2020, ND Paper sent MSI a letter, identified as a "Termination Notice," alerting MSI that it has deemed MSI to be in material breach of the Contract, and withdrawing the Project, in total, pursuant to Paragraph 30.1 of Schedule H.  (Dean Decl., Ex. 18 (dkt. #65-18).)

[4] MSI purports to dispute this account on the basis that the truck driver "does not recall" whether anyone from ND Paper blocked an exit, which, setting aside its materiality, is certainly less than a denial and arguably a concession.

adequately disclosed and are the subject of a motion to compel pending at the time of the parties' submissions.  Nonetheless, in its proposed findings, ND Paper explains in great detail that it calculated this estimate by (1) inventorying the stainless steel that remained at the mill, (2) inventorying the stainless steel that was removed, and (3) comparing it to the drawings and specifications of the 1,000 TPD tank to determine the weight of the stainless steel that was removed by MSI.  (ND Paper's PFOFs (dkt. #59) ¶¶ 42-46; *id.* ¶ 47 (summary chart).)

Based on this estimate, ND Paper calculates the value of the materials MSI removed from ND Paper's mill to be $201,802.00.  ND Paper also represents that it hired other contractors to construct a tank as a substitute for the 1,000 TPD tank that it initially contracted with MSI to build.  MSI purports to dispute this on the basis that ND Paper has only identified "Tarsco" as a contractor on site after MSI demobilized and only produced one document regarding that contractor's involvement.

### E.  Procedural Posture

MSI commenced this action on June 8, 2020, asserting claims against ND Paper for construction lien foreclosure, breach of contract, unjust enrichment and account stated, while seeking damages in excess of $900,000 for ND Paper's failure to pay MSI for its work to date.  After the court denied an initial motion to dismiss, ND Paper filed its answer and asserted counterclaims against MSI for breach of contract, conversion, unjust enrichment and civil theft under Wis. Stat. §§ 943.20 and 895.446.  In addition, ND Paper brought a third-party complaint against the individually named MSI employees detailed above for civil theft under Wis. Stat. §§ 943.20 and 895.446, as well as conversion and

aiding and abetting.  In its third-party complaint, ND Paper claims that these individuals are personally liable without alleging that their liability arises within the scope of their employment.

## OPINION

The parties have filed cross-motions on ND Paper's counterclaims and third-party complaint.  MSI and the individual MSI employees seek judgment in their favor based on the following arguments:  (1) ND Paper's third-party complaint is procedurally improper; (2) ND Paper's third-party complaint fails as a matter of law because the individuals were acting within the scope of their employment; and (3) the conversion claim in the third-party complaint and in the counterclaim against MSI are barred by the economic loss doctrine.  In turn, ND Paper seeks summary judgment against MSI and the individual defendants on its civil theft, conversion and unjust enrichment claims (the last of which having only been asserted against MSI).  In support of its motion, ND Paper largely relies on provisions in the Contract that describes the Owner's interest in Equipment as quoted above.  The court addresses each argument in turn, beginning with those presented in MSI's and its employees' motion.

## I.  MSI and its Employees' Motion for Partial Summary Judgment

### A.  Propriety of Third-Party Complaint

The individual MSI employees seek summary judgment in their favor on ND Paper's third-party complaint on the basis that it is procedurally improper under Federal Rule of Civil Procedure 14.  For support, these employees direct the court to decisions

8

holding that a third-party claim "is appropriate only where the third-party defendant's liability to the third-party plaintiff is dependent on the outcome of the main claim; one that merely arises out of the same set of facts does not allow a third-party defendant to be impleaded." *Am. Zurich Ins. Co. v. Cooper Tire & Rubber Co.*, 512 F.3d 800, 805 (6th Cir. 2008); *see also* MSI's Opening Br. (dkt. #64) 7-8 (discussing other cases).  While MSI cites a number of cases from other circuits, it also cites a case from this court.  In *Burnette v. County Mutual Insurance Company*, No. 12-cv-019-slc, 2013 WL 12234282 (W.D. Wis. May 2, 2013), the court explained that a "crucial characteristic of [a] Rule 14 claim is that defendant is attempting to transfer to third-party defendant the liability asserted against defendant by the original plaintiff; [the] mere fact that [a] third-party claim arises from the same transaction or set of facts as [the] original claim is not enough." *Id.* at *8 (citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Practice & Proc. § 1446 at 415-21 (3d ed. 2010)).

Here, any liability on the part of the individual MSI employees is not dependent on the outcome of MSI's claims against ND Paper.  In other words, ND Paper is not seeking to pass on its liability to the individual MSI employees.  In its opposition, ND Paper attempts to craft a response based on an argument that the third-party complaint here is appropriate because "the actions of the third-party defendant precipitate a chain of events that results in plaintiff's claim against the defendant-third party plaintiff."  (ND Paper's Opp'n (dkt. #74) 7 (citing *Aetna Cas. & Sur. Co. v. Kochenour*, 45 F.R.D. (M.D. Pa. 1968)).)  However, ND Paper stops short of explaining -- nor can the court conceive of a credible explanation -- why MSI's breach of contract and related claims against ND Paper based on

its lack of payment were precipitated by the individual MSI employees' separate actions in allegedly wrongfully removing equipment from the Mill.

In the alternative, ND Paper argues that the court should construe ND Paper's third party-complaint as a Rule 13(h) counterclaim against permissible parties under Rule 20(a). This argument has substantially more traction, especially given that there would appear to be no prejudice to the individual MSI employees in any mislabeling of the pleading asserted against them.  However, the court need not decide this issue in light of the obvious fact that ND Paper has failed to put forth *any* evidence from which a reasonable jury could conclude that these individual MSI employees were acting out of some personal interest, separate and apart from their obvious employment obligations.  Instead, as explained in the subsection immediately below, the overwhelming evidence compels exactly the opposite conclusion.

### B. Claims against Individual MSI Employees

The individual MSI employees also seek summary judgment in their favor on ND Paper's third-party complaint based on the fact that the undisputed record does not support a finding that they personally committed tortious conduct, but rather were acting within the scope of their employment to support MSI's interest and at MSI's direction. Relatedly, with respect to the aiding and abetting claim, these defendants contend that their interest is wholly aligned with and the same as MSI's interest, causing any aiding or abetting theory to fail as a matter of law.

Under Wisconsin Statute § 943.20, theft is defined as one who "[i]ntentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property

of another without the other's consent and with intent to deprive the owner permanently of possession of such property."[5]   Similarly, the elements of a common law conversion claim are (1) intentional control or taking of property belonging to the plaintiff (2) without the plaintiff's consent (3) resulting in serious interference with the plaintiff's right to possess the property. *First Weber Grp., Inc. v. Horsfall,* 738 F.3d 767, 773 (7th Cir. 2013) (citing *H.A. Friend & Co. v. Prof. Stationery, Inc.,* 2006 WI App 141, 294 Wis. 2d 754, 720 N.W.2d 96, 100).

While the elements of the claims do *not* require a showing that the thief or wrongful converter used or intended to use the stolen property for his or her personal benefit, civil liability in the tort context can only extend to individuals who engage in tortious conduct personally.   As the Wisconsin Supreme Court explained in *Stuart v. Weisflog's Showroom Gallery, Inc.,* 2008 WI 22, 308 Wis. 2d 103, 746 N.W.2d 762, "merely being an officer, agent, employee, representative, shareholder, or director will not be enough to impose individual liability on a person in such a class in the absence of proof that he or she was personally responsible for prohibited, unfair dealings or practices."  *Id.* at ¶ 41 (finding corporate employee may be personally liable under the Home Improvement Practices Act based on misrepresentations about product quality); *Hammer v. ILHR Dep't,* 92 Wis. 2d 90, 97, 284 N.W.2d 587 (1979) (explaining that corporate officers are responsible for own tortious conduct, including terminating own employment to obtain unemployment compensation before business declared bankruptcy); *Oxmans' Erwin Meat Co. v. Blacketer,*

---

[5] Relatedly, Wis. Stat. § 895.446(1) grants a right to civil action for anyone who suffers damage or loss under § 943.20, among other statutes.

11

86 Wis. 2d 683, 692-93, 273 N.W.2d 285 (1979) (explaining in the context of a challenge to personal jurisdiction that corporate officers can be personally liable for misrepresentations the officers "personally commit[ted] or participate[d] in"); *Ferris v. Location 3 Corp.*, 2011 WI App 134, ¶¶ 14-15, 337 Wis. 2d 155, 804 N.W.2d 822 (concluding that corporate agents could be found liable for their own alleged tortious conduct in making misrepresentations on a real estate disclosure form).

The undisputed record reflects that MSI's Vice President Pumper directed the other MSI employees to remove the disputed materials, and those individuals followed his directions.  There is simply *no* evidence that the individuals engaged personally in tortious conduct by removing the Equipment from the ND Paper mill.  Unlike the defendants described in the cases above, these third-party defendants did not lie about product quality, did not make a business decision to further their personal interests, and did not make misrepresentations on a business form.  In short, there is *nothing* independently tortious about their actions to warrant individual liability.

In response, ND Paper principally argues that it *alleged* that the third-party defendants are "personally liable" to ND Paper for removing the property, and did not allege that their liability arises from the scope of their employment.  (ND Paper's Opp'n (dkt. #74) 15 (citing Third-Party Compl. (dkt. #36) ¶ 41).)  At this stage in the case, however, ND Paper cannot rest on the allegations in its pleadings.  Rather, at summary judgment, ND Paper must put forth evidence to support a finding that the individuals engaged in tortious conduct personally, and the undisputed evidence as described above would not permit such an inference.  *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927,

938 (7th Cir. 2021) (explaining that summary judgment is frequently referred to as the "proverbial put up or shut up" phase of a case, "when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (internal citation and quotation marks omitted).

With respect to the aiding and abetting claim, ND Paper must show that the individual MSI employees (1) "undert[ook] conduct as a matter of objective fact [that] aids another in the commission of an unlawful act; and (2) consciously desire[] or intend[] that [their] conduct will yield such assistance." *Winslow v. Brown*, 125 Wis. 2d 327, 335-36, 371 N.W.2d 417, 423 (Wis. Ct. App. 1985).  The MSI individual employees seek summary judgment on the ground that there is no basis for finding that the actions of these individuals were separate from the actions of the corporation itself, and, therefore, there is no basis for finding that they aided "another" to support such a claim, analogizing it to civil conspiracy claims.  Specifically, the individual MSI employees direct the court to *Elbe v. Wausau Hospital Center*, 606 F. Supp. 1491 (W.D. Wis. 1985), in which the court explained that "[t]he Court of Appeals for the Seventh Circuit adheres to the view that the actions of agents within the scope of their corporate authority are the acts of a single corporate entity rather than of separate persons." *Id.* at 1502.  At least one other court has applied this same reasoning to dismiss an aiding and abetting civil claim.  *See Janken v. GM Hughes Electronics*, 53 Cal. Rptr. 2d 741, 755 (Cal. Ct. App. 2d 1996) ("[S]ince a corporation can act only through its employees, the element of concert is missing in the 'aiding and abetting' context just as in the conspiracy context.").

In response, ND Paper again argues that that it did not *plead* that the individual

13

MSI employees took some actions within the scope of their employment or that the actions were connected to the employment; instead, they alleged that they are jointly and severally liable by engaging in aiding and abetting.  However, this argument fails to confront the individual MSI employees' argument *and* fails to meet its resulting burden at summary judgment to come forward with affirmative evidence giving rise to a reasonable inference that these individuals were acting outside of the scope of their employment or otherwise for some personal interest that would create liability separate and apart from MSI's.  As such, the court will grant the individual MSI employees' motion for summary judgment in their favor on the aiding and abetting claim as well.[6]

### C. Conversion Claim

Finally, MSI and its employees both seek summary judgment on ND Paper's conversion claim on the basis that it is barred by the economic loss doctrine.  The economic loss doctrine "prevents a plaintiff from claiming tort damages for purely economic losses when the underlying wrongful conduct is a breach of contract between the parties." *Mule-Hide Prods., Inc. v. Mod Panel Manufacturing, Ltd.*, No. 18-cv-659-jdp, 2019 WL 1877170, at *5 (W.D. Wis. Apr. 26, 2019); *see also Schreiber Foods, Inc. v. Lei Wang*, 651 F.3d 678,. 680 (7th Cir. 2011) (explaining that the doctrine "bars tort liability when the plaintiff has a contract with the defendant and contract law provides an adequate remedy for the type of injury alleged").

---

[6] Alternatively, even if there were some hook to find personal tortious conduct, the claims against the MSI employees would be barred by the economic loss doctrine or by the limitation of liability clause under Schedule H of the contract, as explained below.  *See infra* Opinion § I.C & n.7.

In response, ND Paper argues that the economic loss doctrine does not apply because its non-contract claims are not premised on a defective product, but instead concern MSI's failure to perform under the terms of the contract.  In support of this curious distinction, ND Papers cites *H.A. Friend & Company v. Professional Stationery, Inc.*, 2006 WI App 141, 294 Wis. 2d 754, 720 N.W.2d 96, in which the Wisconsin Court of Appeals reversed a circuit court's dismissal of non-contract claims under the economic loss doctrine. Specifically, the court of appeals considered whether a conversion claim could proceed against the sole shareholder of a now-defunct company despite the plaintiff having entered into a franchise agreement with the company, based on the shareholder's drawing down of funds in the company's bank accounts.  The court of appeals began by discussing the shareholder-defendant Van Der Puy's argument and the policy underlying Wisconsin's economic loss doctrine:

> Van Der Puy argues that pursuant to the economic loss doctrine, the only remedy available to [plaintiff] Friend is through its breach-of-contract claim. The economic loss doctrine is a judicially created doctrine that seeks to preserve the distinction between contract law and tort. *Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 15, 276 Wis. 2d 361, 688 N.W.2d 462. From its inception, the doctrine has been founded on the premise that contract law, and particularly the law of warranty, is better suited than tort law for addressing purely economic loss in the commercial arena. *Id.* The economic loss doctrine states that the purchaser of a product cannot recover from its maker or seller in tort for damages that are solely economic. *See Kailin v. Armstrong*, 2002 WI App 70, ¶ 27, 252 Wis. 2d 676, 643 N.W.2d 132. Thus, Van Der Puy argues, the economic loss doctrine prevents Friend from recovering under any legal theory other than breach of contract.

*Id.* at ¶ 14.  While acknowledging "the extensive reach of the economic loss doctrine," the

court of appeals nonetheless concluded that it did not cover the dispute between the companies since

> there was no defective product or service involved. Our supreme court revisited the economic loss doctrine and reiterated that "'[e]conomic loss' for purposes of the doctrine is defined as 'the loss in a product's value which occurs because the product is inferior in quality and does not work for the general purposes for which it was manufactured and sold.'" *Cease Electric*, 276 Wis. 2d 361, ¶ 23 (citation omitted) (emphasis added). The [defendant's] checking account and the money market fund are distinguishable from the defective product type of economic loss targeted by the doctrine.

*Id.* at ¶ 15.

In an attempt to distinguish the court of appeals' holding in *H.A. Friend*, MSI argues that unlike the franchise agreement considered in that case, Wisconsin's economic loss doctrine is routinely applied to construction contracts, which are construed as contracts for goods, not for services. (MSI's Reply (dkt. #86) 17-18.)  However, this argument misses the mark.  Even accepting that construction contracts like that at issue here constitute a contract for goods, not for services, ND Paper is not arguing that the doctrine does not apply because it is one for services.  Instead, ND Paper contends that its conversion claim is not based on any defective product *or* service, but rather on a wrongful theft or conversion as in *H.A. Friend*.

At the same time, ND Paper's argument that this dispute does not involve a defective product does not reflect the undisputed record.  As described above, ND Paper withheld payments because of MSI's refusal to provide promised designs.  Viewed in this light, ND Paper's claims *do* implicate a defective product theory of a sort, since MSI was not delivering the promised product, which included both the design and construction of

16

the 1,000 TPD water tower.  Regardless, as MSI argues, the economic loss doctrine's application is *not* limited to defective products.  Indeed, in *H.A. Friend & Co.*, the very case on which ND Paper principally cites in pressing its argument that the doctrine is limited to defective products, the court recognized its expansive reach:

> Since the initial recognition of the economic loss doctrine, Wisconsin courts have significantly expanded the doctrine's scope and breadth. Wisconsin has eliminated any requirement of contractual privity, disregarded arguments that the doctrine leaves parties with no alternative remedy, applied the doctrine to services incidental to the purchase, rejected "bootstrapping" noneconomic losses of third parties, rejected creating an exception for "sudden and calamitous" occurrences, applied the doctrine to commercial real estate purchases, and applied the doctrine to encompass consumer transactions.

2006 WI App 141, at ¶ 15 (quoting John J. Laubmeier, Comment, Demystifying Wisconsin's Economic Loss Doctrine, 2005 WIS. L. REV. 225, 229 (2005) (footnotes omitted)).

Here, plaintiff seeks to pursue a tort remedy *premised* on Section 6.1 of the parties' Contract, which describes the ownership interest in Equipment and provides a basis for ND Paper to argue that it owned the steel, either because it had already paid for the steel or because the steel was on its property.  As such, the court agrees that unlike the tort claim in *H.A. Friend*, which was not premised on a breach of the parties' fraudulent agreement, defendant's tort claim here seeks recovery of purely economic losses *based on* a breach of the Contract itself.  *See Mule-Hide Prods.*, 2019 WL 1877170, at *5.

Finally, even if not barred by a general application of Wisconsin's economic loss doctrine, defendant's conversion claim was also expressly contracted away by the limitation of liability clause in Schedule H of the Contract, which as quoted above, disavows any

claim to damages other than provided for in the Contract itself. Thus, whatever remains of a claim for conversion under the economic loss doctrine was knowingly contracted away by both sides to this particular agreement, which after all is the underlying principle giving rise to the doctrine itself. *See Insurance Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 15, 276 Wis. 2d 361, 688 N.W.2d 462 ("From its inception, the doctrine has been based on the understanding that contract law, and particularly the law of warranty, is better suited than tort law for dealing with purely economic loss in the commercial arena."). As such, the court will grant MSI's motion for summary judgment on the conversion counterclaim.[7]

## II. ND Paper's Motion for Summary Judgment

Having granted summary judgment to the individual MSI employees on all claims in the third-party complaint and to plaintiff MSI on ND Paper's conversion counterclaim, the court takes up ND Paper's motion for partial summary judgment with regard to the remaining civil theft and unjust enrichment counterclaims against MSI. Because ND Paper is moving for summary judgment on claims for which it bears the burden of proof, the court evaluates the motion under a different and more onerous standard. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (explaining that plaintiff "must lay out the elements of the claim, cite the facts [that] it believes satisfies these

---

[7] MSI did not move for judgment in its favor on the civil theft claim, likely because the law is clear that the economic loss doctrine does not bar statutory claims. *See, e.g., Stuart v. Weisflog's Showroom Gallery, Inc.*, 2008 WI 22, ¶ 33 n.12, 308 Wis. 2d 103, 746 N.W.2d 762 (explaining that economic loss doctrine "cannot apply to statutory claims"); *Ferris v. Location 3 Corp.*, 2011 WI App 134, ¶ 13, 337 Wis. 2d 155, 804 N.W.2d 822 (relying on *Stuart* to hold that the economic loss doctrine does not bar civil theft statutory claim). Still, the court would be remiss not to note that the claim appears barred by Schedule H of the Contract, likely limiting ND Paper to contractual remedies for the removal of the Equipment.

elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim").

As described above, a common law, civil theft occurs when an individual "[i]ntentionally takes and carries away, uses, transfers, conceals, or retains possession of movable property of another without the other's consent and with intent to deprive the owner permanently of possession of such property." Wis. Stat. § 943.20; *see also* Wis. Stat. § 895.446(1) (providing right to civil action for anyone who suffers damage or loss under § 943.20, among other statutes).  With respect to the civil theft claim here, plaintiff contends that there is no dispute that MSI intentionally took equipment from the ND Paper mill, without ND Paper's consent, with knowledge that ND Paper did not consent, and with an intent to deprive ND Paper of the benefits of this property.  (ND Paper's Opening Br. (dkt. #58) 13-19.)  Of course, the motion rests on a finding that the equipment was owned by ND Paper, rather than by MSI.  ND Paper contends that there are two bases for finding that it owned the equipment:  (1) it paid for it; and (2) Section 6.1 of the Contract defined it as the owner of the equipment.

With respect to both theories, however, there are factual disputes that prevent entry of summary judgment.  First, with respect to payment, while there is no dispute that ND Paper made certain payments toward the 1,000 TPD tank, there is also no dispute that ND Paper at some point withheld payment or, at minimum, did not make all of the required payments.  Given the uncertainty over what may be owed, ND Paper cannot rely on the fact that it made *some* payments to claim an ownership interest in the steel.  At minimum, plaintiff has failed to put forth sufficient evidence foreclosing a finding that

MSI retained an ownership interest in the equipment.

Second, with respect to its reliance on the Contract, part of Section 6.1 defines ownership of Equipment based on its transfer to ND Paper's property,[8] independent of any payment. However, MSI responds in its opposition brief that ND Paper had breached the Contract before its removal of the equipment by failing to pay, thus precluding ND Paper's ability to enforce the contract terms. (MSI's Opp'n (dkt. #77) 16-17 (citing "breach first" cases).) As such, MSI contends that the contract does not govern the ownership terms of the removed equipment. As to this theory, the court similarly finds that factual disputes preclude summary judgment in ND Paper's favor on these claims.

"To prevail on an unjust-enrichment claim, a plaintiff must prove three elements: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; and (3) acceptance and retention by the defendant of the benefit under circumstances such that it would be inequitable to retain the benefit without payment of the value thereof." *Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 557 F.3d 469, 477 (7th Cir. 2009), *as amended* (Mar. 18, 2009) (internal citation and quotation marks omitted). Unjust enrichment, as ND Paper acknowledges, is an alternative basis for relief if its breach of contract counterclaims fail. (ND Paper's Opening Br. (dkt. #58) 20.) As such, it is also premature to consider ND Paper's motion for summary judgment in its favor on its unjust enrichment counterclaim, other than to note that this claim, too, turns

---

[8] "Notwithstanding the foregoing, title to all Equipment for which payment has not been received by the Contractor shall pass to the Owner upon delivery of the Equipment to the Mill." (Compl., Ex. 1 ("Contract") (dkt. #2-1) 4.)

on disputes of fact as to the ownership of the equipment and whether it would be inequitable for MSI to retain the benefit of the  equipment.

## ORDER

IT IS ORDERED that:

1) Counterclaimant and third-party plaintiff ND Paper, Inc.'s motion for partial summary judgment (dkt. #57) is DENIED.

2) Counter-defendant MSI and third-party defendants Paul Lester, Billy Owens, Jason Koester and Mike Prahl's motion for partial summary judgment (dkt. #63) is GRANTED.  Summary judgment is entered in favor of MSI on ND Paper's conversion counterclaim and in favor of the third-party defendants on ND Paper's third-party complaint.

3) At the close of this case, the clerk's office is directed to enter judgment in favor of MSI on ND Paper's conversion counterclaim and in favor of the third-party defendants on ND Paper's third-party complaint.

Entered this 5th day of May, 2022.

BY THE COURT:


/s/
_____
WILLIAM M. CONLEY
District Judge

21